IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | |
|---|---|
| APRIL C. TOMPKINS,  )<br>    Plaintiff )<br>v.  )<br> )<br>CAROLYN W. COLVIN,  )<br> Acting Commissioner of  )<br> Social Security,  )<br>    Defendant  ) | Civil Action No. 2:14cv00014<br>**MEMORANDUM OPINION**<br><br>By: PAMELA MEADE SARGENT<br>United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, April C. Tompkins, ("Tompkins"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Tompkins protectively filed her applications for SSI and DIB on June 4, 2010, alleging disability as of October 5, 2009, due to diabetes, depression, lethargy, neuropathy, vision problems, kidney problems and urinary tract infections. (Record, ("R."), at 13, 80-81, 105, 131, 440-43.) The claims were denied initially and upon reconsideration. (R. at 59-63, 69-71, 444-46, 449-51.) Tompkins then requested a hearing before an administrative law judge, ("ALJ"). (R. at 72.) A video hearing was held on May 10, 2013, at which Tompkins was represented by counsel. (R. at 456-83.)

By decision dated May 31, 2013, the ALJ denied Tompkins's claims. (R. at 13-24.) The ALJ found that Tompkins met the disability insured status requirements of the Act for DIB purposes through September 30, 2014. (R. at 15.) The ALJ found that Tompkins had not engaged in substantial gainful activity since October 5, 2009, the alleged onset date. (R. at 15.) The ALJ found that the medical evidence established that Tompkins had severe impairments, namely obesity; gestational diabetes mellitus; hypertension; bipolar disorder; polysubstance abuse in remission; personality disorder; and anxiety, but he found that Tompkins did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) The ALJ found that Tompkins had the residual functional capacity to perform

low-stress light work[1] that required no more than occasional stooping, crouching, crawling and kneeling, that did not require her to climb ladders, ropes or scaffolds, that did not require concentrated exposure to respiratory irritants and chemicals or even moderate exposure to hazardous machinery and unprotected heights, that required no more than frequent balancing and climbing ramps and stairs and that required no more than occasional decision making, changes in the work setting and interaction with co-workers and the public. (R. at 19.) The ALJ found that Tompkins could not perform any of her past relevant work. (R. at 22.) Based on Tompkins's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Tompkins could perform, including jobs as a packer, an inspector/grader and an assembler. (R. at 22-23.) Thus, the ALJ concluded that Tompkins was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2014).

After the ALJ issued his decision, Tompkins pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 6-9.) Tompkins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2014). This case is before this court on Tompkins's motion for summary judgment filed November 21, 2014, and the Commissioner's motion for summary judgment filed January 26, 2015.

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2014).

## II. Facts

Tompkins was born in 1976, (R. at 80, 460), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Tompkins has a high school education and an associate's degree in education. (R. at 132, 460.) She has past work experience as a cashier, a desk clerk, a waitress, an office manager, a dispatcher and a caregiver. (R. at 112, 132.) Tompkins testified at her hearing that she experienced panic attacks several times a week, with each attack lasting seven to 10 minutes. (R. at 461-62.) She stated that she experienced crying spells a couple of times a week, and each spell lasted for hours. (R. at 462.) Tompkins stated that she was easily distracted which made it difficult for her to complete tasks. (R. at 463.) She stated that her medication helped her to feel "a lot better." (R. at 464.) Tompkins stated that due to her diabetes, she experienced low energy, poor eyesight and neuropathy. (R. at 466-67.) She stated that the neuropathy caused her feet to burn and tingle, which made it difficult to stand and walk. (R. at 467.) Tompkins stated that the neuropathy in her hands made it difficult to grip and to hold items. (R. at 467-68.)

Robert Jackson, a vocational expert, also was present and testified at Tompkins's hearing. (R. at 476-81.) Jackson was asked to consider a hypothetical individual who could perform medium[2] work that required her to frequently climb ramps and stairs and balance; to occasionally stoop, kneel, crouch and crawl; never climb ladders ropes or scaffolds; and to avoid concentrated exposure to irritants and chemicals and moderate exposure to hazards, such as moving machinery and

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2014).

heights. (R. at 478.) Jackson stated that such an individual could perform Tompkins's past work as a waitress, a dispatcher and a billing clerk. (R. at 478.) Jackson was asked to consider a hypothetical individual who would be limited to performing light[3] work with the same limitations as previously mentioned. (R. at 478-79.) He stated that the individual could perform all three jobs previously identified. (R. at 479.) Jackson stated that these jobs would be eliminated should the individual be limited to only occasional decision making, occasional changes in the work setting and occasional interaction with the public and co-workers. (R. at 479.) However, he stated that other light jobs existed in significant numbers that such an individual could perform, including jobs as a packer, an inspector/grader and an assembler. (R. at 480.) Jackson was then asked to consider the same individual, but who could only frequently handle, finger and feel objects, who would be off task no more than 10 percent of the workday and who would potentially be absent from the workplace no more than one time per month. (R. at 480-81.) He stated that the individual could perform the jobs mentioned. (R. at 481.) However, Jackson stated that there would be no jobs available for an individual who would be off task at least 20 percent of the workday and who would be absent at least three times per month. (R. at 481.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Bert Spetzler, M.D., a state agency physician; Eugenia Hamilton, Ph.D., a state agency psychologist; Dr. William Humphries, M.D.; Mountain View Regional Medical Center; Norton Community Hospital; The Health Wagon; Dr. Uzma Ehtesham,

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2014).

M.D.; Dr. Virginia A. Baluyot, M.D.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Southwest Virginia Regional Jail Authority; and Duffield Regional Jail.

Tompkins was incarcerated at the Southwest Virginia Regional Jail Authority in 2006 and 2012. (R. at 384-405.) She was diagnosed with questionable tension headaches, and her hypertension was controlled. (R. at 404.) In July 2012, a mental health treatment note indicated that Tompkins interacted with other inmates and participated in recreational activities. (R. at 385.) A mental health assessment indicates that Tompkins complained that her medications were not working as well. (R. at 390-93.) She reported that she had suffered from depression and anxiety for years and that she had been sexually abused. (R. at 390.) Tompkins reported sadness, difficulty sleeping and anxiety, often resulting in panic attacks. (R. at 390.) She stated that her sister had recently passed away. (R. at 391.) The examiner reported that Tompkins's appearance, behavior, speech, perceptions, cognitive level and thought processes were within normal limits. (R. at 393.) Tompkins had an anxious and depressive mood, and her insight and judgment were deemed to be poor. (R. at 393.) She was diagnosed with major depressive disorder and anxiety disorder, not otherwise specified. (R. at 393.) Tompkins's then-current Global Assessment of Functioning score, ("GAF"),[4] was assessed at 40.[5] (R. at 393.)

---

[4] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[5] A GAF score of 31-40 indicates that the individual has "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ...." DSM-IV at 32.

On January 11, 2009, Tompkins presented to the emergency room at Norton Community Hospital for injuries sustained after being assaulted by a customer at her place of employment. (R. at 192-201.) She reported soreness in her lower back and left arm. (R. at 198.) She was discharged with a diagnosis of contusion and lumbosacral sprain. (R. at 194.)

Tompkins was treated at The Health Wagon from 2010 through 2012 for diabetes mellitus, neuropathy, ankle pain and depression. (R. at 202-24, 406-09.) On December 13, 2011, Paula Meade, FNP, a family nurse practitioner, stated that Tompkins's condition met or equaled medical listing § 6.02(C). (R. at 309.) Meade reported that Tompkins had uncontrolled diabetes, which resulted in renal damage and severe peripheral neuropathy. (R. at 309.) On March 16, 2012, Tompkins had normal motor strength in her upper and lower extremities. (R. at 407.) Her sensory examination was normal, and she was alert and oriented. (R. at 407.)

On April 28, 2010, Tompkins presented to the emergency room at Mountain View Regional Medical Center, ("Mountain View"), with complaints of right ankle pain after sustaining a fall the previous night. (R. at 174-84.) Tompkins also complained of anxiety. (R. at 178.) X-rays of Tompkins's right ankle showed soft tissue swelling and widening of the lateral tibiotalar joint space. (R. at 186.) X-rays of Tompkins's right foot showed an inferior calcaneal spur. (R. at 187.) On June 2, 2010, Tompkins presented to the emergency room with complaints of low back pain. (R. at 163-72.) She was diagnosed with acute low back pain and myofascial lumbar strain. (R. at 164.) On October 18, 2011, Tompkins presented to the emergency room for an abscess to her left wrist. (R. at 320-34.) On October 21, 2011, Tompkins was seen for a recheck of her left wrist wound. (R. at 310-19.)

The record shows that Tompkins received Suboxone treatment from Dr. Virginia A. Baluyot, M.D., from July 2010 through September 2011. (R. at 254-88.) During that time, drug testing showed Tompkins to be positive for benzodiazephine, buprenorphine, marijuana and cocaine. (R. at 260, 281.)

On September 21, 2010, Dr. William Humphries, M.D., examined Tompkins at the request of Disability Determination Services. (R. at 158-62.) Tompkins reported that she consumed two alcoholic beverages every two months. (R. at 159.) Dr. Humphries reported that Tompkins was alert and pleasant. (R. at 159.) Her thought content, memory and intelligence were within normal range. (R. at 159.) Dr. Humphries reported that the range of motion of Tompkins's neck and back was mildly reduced. (R. at 159.) She had tenderness to palpation of the posterior cervical spine and the thoracolumbar region. (R. at 159.) No scoliosis or muscle spasm was noted. (R. at 159.) Dr. Humphries noted that Tompkins's joint range of motion of the upper extremities was slightly reduced in both shoulders, but within normal limits in both elbows, wrists and hands without significant tenderness, heat, swelling or deformity. (R. at 160.) Her lower extremity joint range of motion was mildly reduced in both hips and both knees, but within normal limits in both ankles without significant tenderness, heat, swelling or deformity. (R. at 160.) Dr. Humphries diagnosed obesity; diabetes mellitus, insulin-dependent with mild peripheral neuropathy of four extremities; asthmatic bronchitis with mild chronic obstructive pulmonary disease; seizure disorder, by history; post-traumatic degenerative joint disease of the right foot; and hypertension, by history, then-currently controlled. (R. at 161.)

Dr. Humphries opined that Tompkins could sit, stand and/or walk six hours in an eight-hour workday and occasionally lift items weighing up to 25 pounds and

-8-

frequently lift items weighing up to 10 pounds. (R. at 161.) He opined that Tompkins would be limited to occasional climbing, kneeling and crawling, with no restrictions on her ability to stoop or crouch. (R. at 161.) Dr. Humphries opined that Tompkins should avoid heights, hazards and fumes and that she could not perform continuous gripping and grasping or continuous foot controls. (R. at 161.)

On September 28, 2010, Dr. Bert Spetzler, M.D., a state agency physician, opined that Tompkins had the residual functional capacity to perform medium work. (R. at 41-42.) He found that Tompkins could occasionally stoop, kneel, crouch and crawl; frequently balance and climb ramps and stairs; and never climb ladders, ropes and scaffolds. (R. at 41-42.) No manipulative, visual or communicative limitations were noted. (R. at 42.) Dr. Spetzler opined that Tompkins should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation and avoid even moderate exposure to hazards, such as machinery and heights. (R. at 42.)

The record shows that Tompkins saw Dr. Uzma Ehtesham, M.D., from 2010 through 2012. (R. at 225-50, 252-53, 303-08, 411-14.) In November 2010, Dr. Ehtesham diagnosed Tompkins with bipolar disorder, single manic episode, moderate; and generalized anxiety disorder. (R. at 250.) Dr. Ehtesham reported that Tompkins had an anxious affect and congruent mood and thought. (R. at 248.) Tompkins was agitated and tearful, but had good insight and intact judgment and reality testing. (R. at 248.) Dr. Ehtesham assessed Tompkins's then-current GAF score at 58.[6] (R. at 248.) On December 23, 2010, Tompkins reported that her anxiety was less severe; however, she reported that her mood swings were intense,

---

[6] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning…." DSM-IV at 32.

and she was crying a lot. (R. at 252.) On January 29, 2011, Tompkins reported that she had a manic episode and that her anger was more severe. (R. at 243.) On February 4, 2011, Tompkins reported that her anger was improving. (R. at 241.) On March 2, 2011, Tompkins reported that she had increased anger. (R. at 239.) On April 20, 2011, Tompkins reported that she was doing fair and that her anger had decreased. (R. at 237.) On May 19, 2011, Tompkins reported that her anger had decreased. (R. at 235.) On June 20, 2011, Tompkins reported that she experienced anger and anxiety daily. (R. at 233.) She reported that she was homeless. (R. at 233.) On July 13, 2011, Tompkins reported that her boyfriend had beaten her up, which caused her to experience more anxiety. (R. at 230.) On August 19, 2011, Tompkins reported less anger and rage attacks. (R. at 229.) On September 14, 2011, Tompkins reported that she was more restless. (R. at 227.) On October 13, 2011, Tompkins reported that her depression was improving, but she had been experiencing more panic attacks. (R. at 225.) On November 9, 2011, Tompkins reported that her depression was "fair." (R. at 307.) On January 11, 2012, Tompkins reported that her depression had worsened. (R. at 303.)

During treatment, Dr. Ehtesham reported that Tompkins's anxiety ranged from a three to an eight on a 10-point scale. (R. at 225, 227, 230, 233, 235, 237, 239, 241, 243, 252, 303, 305, 307, 411, 413.) Dr. Ehtesham reported that Tompkins's depression ranged from a two to six on a 10-point scale. (R. at 227, 229, 233, 235, 237, 239, 252, 305, 307, 411.) Tompkins's mania ranged from a three to an eight on a 10-point scale. (R. at 229, 241, 243, 252, 303, 413.) Dr. Ehtesham found that Tompkins had fair insight, intact judgment, improved reality testing and no symptoms that impacted her attention. (R. at 225, 227, 229-30, 233, 235, 237, 239, 241, 243, 248, 252.)

On October 28, 2011, Dr. Thomas Henretta, M.D., a state agency physician, opined that Tompkins had the residual functional capacity to perform medium work. (R. at 54-56.) He found that Tompkins could occasionally stoop, kneel, crouch and crawl; frequently balance and climb ramps and stairs; and never climb ladders, ropes and scaffolds. (R. at 55.) No manipulative, visual or communicative limitations were noted. (R. at 55.) Dr. Henretta opined that Tompkins should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation and avoid even moderate exposure to hazards, such as machinery and heights. (R. at 55.)

On September 30, 2010, Howard S. Leizer, Ph.D., a state agency psychologist, opined that Tompkins suffered from an affective disorder and an anxiety-related disorder. (R. at 39-40.) He opined that Tompkins was mildly restricted in performing her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 39.) Leizer opined that Tompkins had not experienced any repeated episodes of decompensation of extended duration. (R. at 39.)

On October 31, 2011, Eugenie Hamilton, Ph.D., a state agency psychologist, opined that Tompkins suffered from an affective disorder and an anxiety-related disorder. (R. at 52-53.) She opined that Tompkins was mildly restricted in performing her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 53.) Hamilton opined that Tompkins had not experienced any repeated episodes of decompensation of extended duration. (R. at 53.)

On February 15, 2012, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Tompkins at the request of Tompkins's attorney. (R. at

289-99.) When asked about her use of ethanol, Tompkins stated that "I am an alcoholic who tries to not drink." (R. at 291.) She reported that she stopped consuming alcoholic beverages all together in 2010. (R. at 291.) Tompkins reported that she stopped using various illicit drugs in September of 2011. (R. at 291.) Tompkins was caught distributing drugs in 2006 and served four months in jail. (R. at 292.) Lanthorn reported that Tompkins exhibited no clinical indicators or signs of ongoing psychotic processes nor any evidence of delusional thinking. (R. at 293.) Tompkins reported that antidepressant medication helped. (R. at 294.) She reported that she enjoyed participating in Zumba when she felt up to it. (R. at 294.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Tompkins obtained a perceptual reasoning score of 79, a verbal comprehensive score of 95 and a full-scale IQ score of 84. (R. at 294-95.) The Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"), was administered, which indicated that Tompkins experienced a significant degree of depression, unhappiness and pessimism about the future. (R. at 296.) The MMPI-2 also indicated that Tompkins had significant problems with concentration, forgetfulness and memory deficits. (R. at 297.) Lanthorn diagnosed bipolar I disorder, most recent episode depressed, severe; polysubstance dependence in early full remission; alcohol dependence in sustained full remission; and personality disorder, not otherwise specified. (R. at 298.) Lanthorn assessed Tompkins's then-current GAF score at 50.[7] (R. at 299.)

Lanthorn completed a mental assessment indicating that Tompkins had an unlimited ability to understand, remember and carry out simple instructions. (R. at 300-02.) He opined that Tompkins had a limited, but satisfactory, ability to

---

[7] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning…." DSM-IV at 32.

understand, remember and carry out detailed instructions and to maintain personal appearance. (R. at 300-01.) Lanthorn opined that Tompkins had a seriously limited ability to follow work rules, to relate to co-workers, to interact with supervisors, to function independently, to maintain attention/concentration, to understand, remember and carry out complex instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 300-01.) He further found that Tompkins had no useful ability to deal with the public, to use judgment, to deal with work stresses and to demonstrate reliability. (R. at 300-01.) Lanthorn opined that Tompkins would be absent from work more than two days a month as a result of her impairments. (R. at 302.)

Tompkins was incarcerated at the Duffield Regional Jail from July 2012 to March 2013. (R. at 416-28.) On February 12, 2013, a mental health contact note indicates that Tompkins had appropriate mood and affect, normal speech and was doing well on her current medications. (R. at 422.) Tompkins reported that her mood had generally been pretty stable until she had an argument with another inmate. (R. at 422.) She stated that she was working as a nighttime hall cleaner and had stopped taking her Trazodone. (R. at 422.) Tompkins reported that she slept well during the day without the medications and reported no side effects with her then-current medications. (R. at 422.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2014). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant

-13-

Case 2:14-cv-00014-PMS   Document 18   Filed 08/24/15   Page 13 of 19   Pageid#: 558

1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2014).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Tompkins argues that the ALJ erred by failing to give full consideration to the findings of Lanthorn when determining the severity of her mental impairments and the resulting effects on her work-related abilities. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) Tompkins also argues that the ALJ erred by making incomplete findings at step three of the sequential evaluation process. (Plaintiff's Brief at 6.) In particular, Tompkins argues that the ALJ provided no support or explanation of how he determined that she had only mild restriction in activities of daily living and moderate difficulties in maintaining social functioning, as well as concentration,

-14-

persistence or pace. (Plaintiff's Brief at 6.) Tompkins also argues that the ALJ erred by failing to find that her impairments met or equaled 20 C.F.R. Part 404, Subpart P, Appendix 1, § 6.02(C). (Plaintiff's Brief at 6-7.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Tompkins argues that the ALJ erred by failing to find that her impairments met or equaled 20 C.F.R. Part 404, Subpart P, Appendix 1, § 6.02(C). (Plaintiff's Brief at 6-7.) Based on my review of the record, I disagree. The ALJ in this case found that Tompkins suffered from severe impairments, including obesity; gestational diabetes mellitus; hypertension; bipolar disorder; polysubstance abuse in remission; personality disorder; and anxiety. (R. at 15.)

To qualify as disabled under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 6.02(C), a claimant must show that she has chronic renal disease that has lasted or can be expected to last for a continuous period of at least 12 months. With

-15-

Case 2:14-cv-00014-PMS   Document 18   Filed 08/24/15   Page 15 of 19   Pageid#: 560

> C. *Persistent elevation of serum creatinine* to 4 mg per deciliter (dL) (100 ml) or greater or *reduction of creatinine clearance* to 20 ml per minute or less, over at least 3 months, with one of the following:
> 1. Renal osteodystrophy … manifested by severe bone pain and appropriate medically acceptable imaging demonstrating abnormalities such as osteitis fibrosa, significant osteoporosis, osteomalacia, or pathologic fractures; or
> 2. Persistent motor or sensory neuropathy; … or
> 3. Persistent fluid overload syndrome with:
>    a. Diastolic hypertension greater than or equal to diastolic blood pressure of 110 mm Hg; or
>    b. Persistent signs of vascular congestion despite prescribed therapy…; or
> 4. Persistent anorexia with weight loss determined by body mass index (BMI) of less than 18.0, calculated on at least two evaluations at least 30 days apart within a consecutive 6-month period…

Based on my review of the record, I find that substantial evidence exists to support the ALJ's finding that Tompkins did not meet or equal § 6.02. Tompkins's treatment for her diabetes was conservative, such as checking her blood sugar and taking insulin, and she did not receive treatment for a renal impairment. Furthermore, Tompkins did not have persistent elevation of serum creatinine to 4 mg per deciliter or greater or reduction of creatinine clearance to 20 ml per minute or less, over at least three months. In fact, diagnostic testing showed that her serum creatinine levels were within normal range. (R. at 182, 185, 188, 208, 220, 354, 423.) Although Meade opined that Tompkins met or equaled § 6.02(C), she failed to support this finding with any evidence. (R. at 309.) In March 2012, Meade found that Tompkins had no edema; full motor strength; intact sensation; and normal peripheral pulses in her upper and lower extremities. (R. at 407.) Meade diagnosed Tompkins with diabetes mellitus, without mention of complication, and assessed no renal impairment. (R. at 407.) In addition, Dr. Humphries opined that Tompkins had "mild" peripheral neuropathy. (R. at 161.) Based on this, I find that

substantial evidence supports the ALJ's finding that Tompkins's impairment did not meet or equal § 6.02(C).

Tompkins further argues that the ALJ erred by failing to give full consideration to the findings of Lanthorn when determining the severity of her mental impairments and the resulting effects on her work-related abilities. (Plaintiff's Brief at 4-6.) Based on my review of the record, I do not find this argument persuasive. The ALJ considered Lanthorn's opinion and concluded that it was entitled to little weight because it was not supported by Lanthorn's own clinical findings, was inconsistent with Tompkins's other mental health treatment records and was based upon a single examination. (R. at 20-21.) The ALJ noted that while Lanthorn found that Tompkins had serious limitations in her ability to maintain attention and concentration, he noted in his written report that she was able to accurately recall four out of five words after a 10-minute delay; correctly spelled "world" forwards and backwards; and correctly performed serial seven's indicating no significant functional limitations in her ability to maintain attention and concentration. (R. at 20-21, 294.) In addition, Lanthorn found that Tompkins had serious to no functional ability to interact socially, but stated in his written report that Tompkins socialized with her boyfriend and family members and volunteered at a home health facility, which required social interaction. (R. at 20-21, 293.) The ALJ also noted that Dr. Ehtesham found that Tompkins had fair insight, intact judgment, improved reality testing and no symptoms that impacted her attention. (R. at 18-21, 225, 227, 229-30, 233, 235, 237, 239, 241, 243, 248, 252.) Based on this, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence.

Case 2:14-cv-00014-PMS   Document 18   Filed 08/24/15   Page 17 of 19   Pageid#: 562

Finally, Tompkins argues that the ALJ provided no support or explanation of how he determined that she had only mild restriction in activities of daily living and moderate difficulties in maintaining social functioning, as well as concentration, persistence or pace. (Plaintiff's Brief at 6.) Based on my review of the record, I find this argument unpersuasive. With regard to Tompkins's activities of daily living, the ALJ noted that she checked her blood sugar and took her medication independently; she prepared simple meals; she cleaned her house and washed laundry; she shopped in stores; she was able to manage money; and a treating physician indicated that Tompkins performed all of her activities of daily living independently. (R. at 17-19, 371.) The record shows that Tompkins was pleasant and cooperative; she spoke normally; she had friends and a boyfriend; she socialized with family members on a daily basis; she reported getting along with authority figures; she volunteered at a home health care facility; she participated in Zumba classes; and while incarcerated, she interacted with other inmates and participated in recreational activities. (R. at 293-94, 371, 385, 393.)

With regard to Tompkins's ability for concentration, persistence and pace, Dr. Ehtesham found that Tompkins had fair insight, intact judgment, improved reality testing and no symptoms that impacted her attention. (R. at 225, 227, 229-30, 233, 235, 237, 239, 241, 243, 248, 252.) Lanthorn found that Tompkins was able to accurately recall four out of five words after a 10-minute delay; correctly spelled "world" forwards and backwards; and correctly performed serial seven's indicating no significant functional limitations in her ability to maintain attention and concentration. (R. at 294.) Dr. Humphries noted Tompkins's thought content, memory and intelligence to be within normal limits. (R. at 159.) In addition, the state agency psychologists opined that Tompkins was mildly restricted in performing her activities of daily living, in maintaining social functioning and in

maintaining concentration, persistence or pace. (R. at 39, 53.) They further found that Tompkins had not experienced any repeated episodes of decompensation of extended duration. (R. at 39, 53.) Furthermore, Tompkins reported that her mood was generally pretty stable. (R. at 422.) She reported that was doing well on her anti-depressant medication and that she experienced no side effects. (R. at 294, 422.) Based on this, I find that substantial evidence exists to support the ALJ's finding with regard to Tompkins's mental residual functional capacity.

Based on the above reasoning, I conclude that substantial evidence supports the ALJ's finding that Tompkins's impairment did not meet or equal § 6.02(C). I also find that substantial evidence exists to support the ALJ's weighing of the medical evidence in determining Tompkins's residual functional capacity. An appropriate order and judgment will be entered.

DATED: August 24, 2015

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-19-

Case 2:14-cv-00014-PMS   Document 18   Filed 08/24/15   Page 19 of 19   Pageid#: 564